## Charles H. Lawrence v. William M. Rhodes.

1. Real Estate Broker—*When Entitled to Commissions.*—The broker is entitled to his commissions if the purchaser presented by him and the vendor, his employer, enter into a valid, binding and enforceable contract. If, after the making of such a contract, even though executory in form, the purchaser declines to complete the sale and the seller refuses to compel performance, the broker is not to be deprived of his commissions. He has done all that he can do when he produces a party who is able, and in binding form, offers to purchase upon the proposed terms.

2. Same—*What an Agreement to Procure a Purchaser Implies.*—An agreement by a real estate broker to procure a purchaser not only implies that the purchaser shall be one able to comply, but that the seller and the purchaser must be bound to each other in a valid contract.

3. Same—*When His Commission is Earned.*—Where the agreement of the real estate broker is to make a sale, his commission is earned when a contract is entered into, which is mutually obligatory upon the vendor and vendee, even though the vendee afterward refuses to execute his part of the contract of sale or purchase.

**Assumpsit,** for commissions. Appeal from the Circuit Court of Cook County; the Hon. Abner Smith, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1899. Affirmed. Opinion filed February 27, 1900.

Marston, Augur & Tuttle, attorneys for appellant.

Bulkley, Gray & Moore, attorneys for appellee.

Mr. Justice Shepard delivered the opinion of the court.

This was a suit by appellee, a real estate broker, against appellant, to recover commissions earned, as claimed, under the following written contract:

"Chicago, May 31st, 1890.

Wm. M. Rhodes, Esq.:

Dear Sir: I hereby agree that if you effect sale of the S. W. ¼ Sec. 25, T. 39 N., R. 12 east of 3d P. M., except W. 100 acres (subject to C., B. & Q. right of way,) at $750 per acre, or better, to pay you 2½ per cent on $750 per acre, and one-half of all above that amount, on closing the sale.

Charles H. Lawrence."

From a judgment for $1,500, recovered in favor of appellee, this appeal is prosecuted. Except as to the conversation between the parties which preceded the making of the agreement, the facts are undisputed.

Evidence of such conversation was offered and admitted, seemingly, for the purpose of showing that before the writing was made, it was understood by the parties that Lawrence should not be liable for commissions unless the buyer that might be procured by Rhodes should actually take the property and pay the price. No objection was interposed to such evidence, and no point is made in the briefs against it. It consisted wholly in the testimony of Lawrence that such was the conversation and understanding between the parties, and of Rhodes in flat contradiction.

The necessary intendment of the verdict is that no such conversation was had, and with the sanction given to the verdict by the trial judge we can not say that the truth is otherwise.

Armed with the contract above set forth, the appellee produced Mr. S. E. Gross as a purchaser of the property, and a written contract (under seal) of purchase and sale of the land was entered into between Lawrence as vendor, and Gross as vendee, dated June 11, 1890.

The material parts of said contract are as follows:

" Said first party (Lawrence) hereby agrees to sell and convey to the second party (Gross) by a good and sufficient warranty deed, with release of dower and homestead rights, subject, however, to the matters hereinafter stated, and said second party hereby agrees to purchase and pay for the premises hereinafter described upon the terms and conditions hereinafter named (describing the premises), and the price to be paid therefor is eight hundred dollars ($800) per acre; fifteen hundred dollars ($1,500) whereof is paid upon the signing of this agreement, and receipt of the same hereby acknowledged. Ten thousand and five hundred dollars ($10,500) more is to be paid upon the delivery of the deed of conveyance, and the balance in three equal annual installments, maturing one (1), two (2), and three (3) years from the date hereof, with interest at six per cent per annum payable semi-annually; said deferred payments to be evi-

denced by notes of the purchaser secured by deed of trust upon said premises, which said trust deed and notes shall be in form satisfactory to first party, the notes being divided into such sums as he shall request, all bearing even date herewith. Said notes shall be payable on or before maturity at maker's option.

Said premises are to be conveyed subject to any easements in the way of streets bordering and traversing the same, and the right of way of the Chicago, Burlington and Quincy Railroad Company, and also subject to taxes for the year 1890, and any special assessments for improvements not already made.

Said party of the first part is to furnish said party of the second part an abstract of title to said premises, or copy thereof, current in Chicago, brought down to date hereof, which shall show a good and valid merchantable title in the party of the first part. * * * In case said second party shall not, upon tender of proper deeds of conveyance to him and of the abstract above described, make the payment of the balance of the cash payment, to wit, ten thousand five hundred dollars ($10,500), and duly execute, acknowledge and deliver to first party the notes and trust deed for the deferred portions of the purchase price hereof as herein provided, then and in that case this agreement shall be null and void, and the earnest money paid hereon may be retained by the first party as payment in full of all damages for non-performance hereof by said second party. * * *

The terms and provisions of this agreement shall extend to and be binding upon the heirs, legal representatives and assigns of both parties hereto.

In witness whereof, said parties of the first and second part have hereunto set their hands and seals the day and year first above written.

Charles H. Lawrence.	(Seal)<br>Samuel E. Gross.	(Seal)"

It may here be noted that the following indorsements were subsequently made upon the contract, viz:

"November 14, 1890.

Received of Mr. Charles H. Lawrence the sum of $1,500 hereinabove mentioned as the deposit made on account of said contract, and release the said Lawrence from all liability under said contract, which is hereby mutually canceled.

S. E. Gross,	(Seal)<br>" By Magruder."

"November 14, 1890.
I hereby release Samuel E. Gross from all liability under the above contract.

CHARLES H. LAWRENCE. (Seal)"

Such indorsements were made without the knowledge or consent of Rhodes. His services and participation in the matter ceased when the contract between Lawrence and Gross was executed, except in the procuring of an abstract of title to the premises, which he finally received from Lawrence on July 29th and delivered to Gross for examination.

The mutual releases of Lawrence and Gross from liability under the contract, and the payment back to Gross by Lawrence of the fifteen hundred dollars paid by Gross on account of the contract price, resulted, not because of any inability of Gross to fully perform the contract, nor because Lawrence did not have "a good and valid merchantable title" to the premises that would pass by his deed, but from mutual agreements arrived at between them at the date of the releases and repayment.

Gross was not called as a witness, and the only evidence as to what occurred between him and Lawrence with reference to the releases and repayment, is the testimony of the latter, which, as reproduced from the abstract to the record, is as follows:

"After that I furnished an abstract to Mr. Gross, and later on I saw Mr. Gross, and he said: 'I do not want to take this property. It is true that your title may be perfectly good, but here are certain proceedings in court for a foreclosure under the Jewett trust deed. I want this property to cut up and sell in cheap lots.'

Counsel for plaintiff: Was Mr. Rhodes present then? A. No, sir. * * *

Mr. Gross said: 'I want to subdivide this into lots, and with the class of customers I have, I want to have an abstract on which there is nothing that would require any question of any lawyer. The class of lawyers they go to is such that if there was anything they can raise a question on they would make trouble, whether it was good or not, and I am not willing to take the deed.' And he did not. That is the substance of the conversation. * * *

After the contract with Gross was signed in 1890, nothing further was done except what has been stated, and except the time when he declined to take the property. After that I paid him back the $1,500 which he had paid as earnest money on the contract, and there was no further negotiations or talk between him and me, or any one in his office, relative to the purchase. I had a conversation with Mr. Rhodes after that in the fall of 1890, and told him how the thing stood—that Mr. Gross would not take the property. He claimed that he was entitled to his commission, and I claimed that he was not.   *   *   *

You are mistaken in understanding that I let Mr. Gross off from the contract signed in June, 1890. That is my signature to the release dated November 14, 1890, appended to the contract offered in evidence. I did not let him off; he had refused to carry it out. I signed that paper, and gave him back the $1,500 as before stated. I did not consult Mr. Rhodes about it.   *   *   *

What I stated this morning was that Mr. Gross said to me that although my title might be perfectly good, yet, inasmuch as there was a proceeding under the Jewett trust deed, which was the second and junior mortgage, that it did not make so much difference whether it was a valid objection or not, because with the class of customers that he dealt with, and the lawyers—cheap attorneys—to whom they usually went, it might make some trouble in the matter. He did not insist that the title was not good. I considered it perfectly good, and you will see there that the decree of foreclosure under the Jewett trust deed, recognizes the sale and foreclosure of the first mortgage under which I got the title. I never tendered a deed to Mr. Gross.

In regard to the return of the $1,500, though I can not give the whole of the conversation word for word—as it occurred some eight years ago—the substance was this: That after he had told me he was not willing to complete the contract and take the property and pay for it, he raised some question about this $1,500, and said to me: 'Now Mr. Lawrence, you understand my position; and while you can not make me take that property I should probably have to sue you to get back my $1,500; I do not think, under the circumstances, you ought to keep that.' The conversation I had with him when I took the first draft of a contract to him, and which was not signed, was referred to, and he said that this matter was spoken of then; that I knew about what he had to have in his business, and that as between man and man in fairness he thought I ought to give that

back to him. I told him I did not know but there was some equity in his claim; that I did not feel like taking his money if he did not get the property, although I wanted him to carry out the contract; that I did not want any law suit, and did not want the title to the property incumbered by a litigation. I told him I would give the $1,500 back to him, and I did.

As to what was said about the enforcibility of the contract, I do not know whether he used the word 'enforce' or whether he said I could not make him take the land and pay for it. I told him I knew that. I do not think the matter of this second mortgage was talked over between Gross and me at the time the contract was signed. It was when the draft, which was not signed, was taken to him. I think I explained to him how it was, what the circumstances were, and that there was a decree for sale there, but no sale; that the decree recognized the foreclosure under the first mortgage, through which I got title; that my title was perfectly good, and I should like to have it understood with him, that was not to be necessarily an objection. He said he was not a lawyer and did not want to pass on a thing in advance and would wait and see.

Counsel: You got him to release you from your obligations under this contract to convey the land, didn't you, Mr. Lawrence?

A. Why, certainly, when he said he would not take it; I was not going to play fast and loose.

Counsel: Did you get that release in writing?

A. Well, what we finally arrived at was evidenced in writing and is indorsed on that contract."

It was proved at the trial, that subsequent to the mutual releases between Gross and Lawrence, the latter sold the premises to one Wallis for $50,500, by deed dated January 10, 1891; that Wallis afterward traded the premises back to Lawrence, and that by deed dated May 2, 1893, Lawrence sold and conveyed the same to one Moore for an actual consideration of $60,000; that said Moore was manager for the said Gross and that he conveyed the premises to Gross by a deed of the same date as the one from Lawrence to himself.

Although this subsequent sale and conveyance of the premises by Lawrence to Moore for the benefit of Gross serves a purpose for some argument, we are not disposed

to place any reliance upon it. It was made after this suit was begun, and does not appear to us to have been the proximate result of the services of Rhodes, but was effected through an entirely different broker.

We are, however, of opinion that Rhodes is entitled, in law, to an affirmance of the judgment, upon the ground that his commission was earned in the first transaction with Gross.

It is said in Wilson v. Mason, 158 Ill. 304:

"The true rule is that the broker is entitled to his commissions if the purchaser presented by him and the vendor, his employer, enter into a valid, binding and enforceable contract. If, after the making of such a contract, even though executory in form, the purchaser declines to complete the sale and the seller refuses to compel performance, the broker ought not to be deprived of his commissions. He has done all that he can do when he produces a party who is able, and, in binding form, offers to purchase upon the proposed terms. An agreement by a real estate broker to procure a purchaser, not only implies that the purchaser shall be one able to comply, but that the seller and the purchaser must be bound to each other in a valid contract. So, where the agreement of the real estate broker is to make a sale, his commission is earned when a contract is entered into which is mutually obligatory upon the vendor and vendee, even though the vendee afterward refuses to execute his part of the contract of sale or purchase."

It is conceded that Gross was abundantly able to perform his contract with Lawrence, if he had chosen to do so, and it is not questioned that Lawrence was bound by the contract, either to convey the premises or to respond in damages if he failed to convey. All, then, that remains to determine whether Lawrence and Gross, the seller and purchaser, were "bound to each other in a valid contract," is to ascertain if Gross was bound by the contract. It may be that Lawrence had contracted not to enforce specific performance against Gross, but yet if Gross were liable to Lawrence in damages for non-performance, he was bound to Lawrence by a valid contract. It ought not, and, we think, does not affect the question of whether Lawrence and Gross were mutually bound to each other, so far as

Rhodes' rights are concerned, that the obligation is remediable in damages alone, and not through specific performance.

Supposing the contract had been so drawn that each party was liable to the other for damages only, for non-performance, both being expressly relieved from any obligation to specifically perform the contract—would it be contended that Rhodes had not earned his commissions? We think not.

And though the damages were stipulated, would that fact deprive the agent of his commissions, the contract being a valid and binding one? We think not, unless by his participation in the making of the contract he should, by implication, be held to have assented that his commissions should not exceed the stipulated damages recoverable by his principal. Leete v. Horton, 43 Conn. 219, is a case where liquidated damages were agreed upon for nonperformance of the contract by either party, and the broker who negotiated the contract sued for his commissions, the sale not having been consummated. The court there says:

" Now, though the plaintiff has not effected a sale or an exchange of the defendant's property, yet he has negotiated a contract for such exchange, agreed to by the defendant, in which contract a sum of money is specified which the defendant agrees to accept, and in consideration of which to relieve Clinton from his obligation to make the exchange of properties. Having thus fixed on the sum of five hundred dollars as an equivalent for the performance of this contract to exchange his property, as between himself and his co-contractor, the defendant can not be allowed to deny that that sum of money is an equivalent as between himself and the plaintiff, by whose aid he made the contract. * * *

Clinton failed to perform the contract, electing, in lieu of performance, to pay, or be compelled to pay, the defendant five hundred dollars, agreed and pronounced by the defendant to be equivalent to performance. The plaintiff, then, having rendered services for the defendant, which he agrees are an equivalent to procuring an exchange of his property, is fairly entitled to the same compensation as he would have been entitled to had the exchange been effected."

To much the same effect is Ward v. Cobb, 148 Mass. 518;

and the case of Greene v. Hollingshead, 40 Ill. App. 195, contains much that is applicable here.

True, Lawrence did not retain the fifteen hundred dollars that he received under the terms of the contract, but, as said, returned the same to Gross rather than suffer litigation or be unfair. But such act can not relieve him from his legal liability to Rhodes, who appears in all fairness to have done everything he had undertaken to do, and for which Lawrence had agreed to pay him. It ought not, and will not, avail Lawrence, that the sale was not closed up, in the sense that Gross took the title and paid the $10,500, and delivered back his notes and trust deed for the balance. Lawrence and Gross having made a binding, valid contract, through the intervention of Rhodes, if Lawrence chose, for purposes of his own, and without the knowledge or consent of Rhodes, to voluntarily relinquish his rights under it, Rhodes ought not to be deprived of what he had legitimately earned.

The instructions that were given to the jury were most favorable to Lawrence, and we discover no material error in the refusal of others. If there be at first blush an inconsistency in the verdict because for too little, it is not improbable that the jury took the view that because Rhodes knew of the terms of the contract, and did not dissent therefrom, and the contract having been waived by the parties to it, he ought not, in fairness, to have any more than the stipulated damages that Lawrence received, but gave up. Such a view of the case is a very fair one to Lawrence, and we are not prepared to say it is not a truly just one.

The judgment of the Circuit Court will be affirmed.